NATIONAL BENEFIT ASSOCIATION, et al, Appellants,
v. INSURANCE COMMISSIONER OF STATE,
et al, Respondents

(34 N. W.2d 166.)

(File No. 8993. Opinion filed October 11, 1948.)

**Morgan & Fuller,** of Mitchell, **George M. Schlosser,** of Chicago, Ill., and **Van Slyke, Agor & Bantz,** of Aberdeen, for Appellants.

**Sigurd Anderson,** Atty. Gen., **Wm. Williamson,** Asst. Atty. Gen., **J. W. Kaye,** of Mitchell, and **Davenport, Evans & Hurwitz,** of Sioux Falls, for Respondents.

RUDOLPH, J.  The question presented by this appeal is whether an assessment life insurance company may through the levying of assessments on its members create and maintain a reserve or surplus fund in addition to the statutory emergency fund required by SDC 31.1903.  The question argued and presented by the briefs goes to the power or authority of such companies to create and maintain reserve or surplus funds.  Neither argued nor presented is the question of whether appellant company, if it has such power or authority, has followed the required statutory procedure in its by-laws and notices of assessments to make valid assessments levied for the purpose of creating reserve or surplus funds. Appellant states in its brief, "It is conceded in this case that each of the companies involved in this appeal has made provision in its by-laws, contract of insurance, and notice of assessment, for the creation of the reserve funds in question."  Respondents do not controvert this statement, nor do they contend otherwise.  We, therefore, neither expressly nor by implication determine in this proceeding this question which has been neither argued nor presented.  The Attorney General in his brief has questioned whether certain by-laws were formally or legally adopted but the stipulated facts set forth these by-laws as being the by-laws of the company so there is no issue as to the validity of the by-laws before this court, nor does it appear that any such issue was presented to the Commissioner or circuit court.

The appellant is an assessment life insurance company organized under SDC 31.19. Its articles of incorporation provide: "The purpose for which this organization is formed is to solicit life insurance, issue life insurance policies, collect assessments and dues as provided for by the by-laws and life insurance contracts of said company, to pay death claims, and in general, to maintain and conduct the business of mutual life insurance company."

SDC 31.1903 relating to assessment life insurance companies is as follows: "Every such company of this state organized upon the mutual assessment, co-operative, or natural premium plan for the purpose of writing assessment life, health, accident, or casualty insurance, shall accumulate and set aside as an emergency fund ten per cent of its gross mortuary or indemnity assessments until the same shall amount to ten thousand dollars and shall thereafter add to such emergency fund five per cent of its gross mortuary or indemnity assessments until such fund shall amount to twenty-five thousand dollars. Such fund or any part thereof may be used for the purpose of paying death or indemnity claims in case of emergency or necessity, pending the making of regular assessments for such purposes and by resolution of the directors or governing board setting forth such emergency or necessity, the Commissioner shall permit withdrawals therefrom for such purposes. Whenever such emergency fund shall be reduced by withdrawals it shall be restored in the same manner by which it was accumulated and the company also may levy assessments for the purpose of restoring such funds. The emergency fund as accumulated shall be deposited with the Commissioner in the form of cash or approved national, state, county, or municipal bonds, or certificates of insured bank deposits, or other securities approved by the Commissioner. No person whose policy or certificate shall have lapsed by reason of non-payment of dues, assessments, or otherwise shall have any interest in or be entitled to participate in such fund."

The appellant company was organized in 1932 and since its organization has built up an extensive business having at the present time more than 35,000 members in good

standing and a total insurance coverage of more than $35,-000,000.00. During the years of its existence the appellant company has levied assessments and charges upon its members which have been in excess of the amounts required to meet death losses, expenses of conducting the business and the maintenance of emergency fund of $25,000 provided by SDC 31.1903 with the result that as of December 31, 1946 the association's total admitted assets were $529,142.50. These assets were carried on the books of the company as follows:

Mortuary fund _____$ 80,188.80
Balance mortuary fund _____$ 70,279.00
Balance emergency fund _____$ 25,000.00
Balance expense fund _____$ 35,353.84
Policyholders equity as set up by the
    auditor of the Department of Insur-
    ance _____$294,521.07

This last mentioned fund as set up on the books of the company has increased substantially since 1946 but the exact amount does not appear in the record. The reason for carrying on the books of the company this account entitled "Policyholders equity" is as follows: In April, 1945, the Commissioner of Insurance inquired of the Attorney General as follows: "May a mutual assessment life company or mutual benefit association maintain a reserve or surplus over and above the emergency fund provided for in SDC 31.1903?"

In response to this inquiry the Attorney General replied that in his opinion such companies are not authorized to maintain a reserve or surplus over and above the statutory emergency fund except that they may maintain a reasonable fund for administrative and managerial purposes and may also maintain a mortuary fund of sufficient size to pay promptly such death claims as their experience has shown may be expected to accrue within a period of 60 days. The appellant company was advised of this opinion of the Attorney General and this item now carried on the books of the company as "Policyholders equity" is the amount of the funds collected by the company in excess of those which

the Attorney General ruled were collected within the authority of the company. Thereafter the appellant company made a request for a formal written ruling upon the question here involved and on October 27th the Commissioner entered his decision substantially in accord with the opinion of the Attorney General and ordered appellant company to refund to its members the fund which was held to be illegally collected, such fund to be paid out to each member in proportion to his contribution thereto. The appellant company appealed to the circuit court under the provision of SDC 31.1116. The decision of the Insurance Commisisoner was affirmed and the company has now appealed to this court.

By a stipulation in the circuit court the following parties were permitted to intervene: State Benevolent Society of Brookings, Northwest Life Association of Brookings, Educational Mutual Benefit Association of Aberdeen, and certain members of the appellant company. However, the Order of the Insurance Commissioner and the affirmance thereof by the circuit court did not directly include the intervenor companies or associations, and no rights of theirs have been directly affected. Because of their interest in the general questions involved, however, we readily accept their briefs upon this appeal as amici curiae.

It appears from the many cases involving this type of insurance that quite generally assessment life insurance companies do maintain surplus funds. The case upon which respondent relies as most clearly pointing out the distinction between the assessment plan and the level premium plan of insurance discloses that the assessment company there involved had reserve or surplus funds amounting to as much as $42,000,000. Jenkins v. Talbot, 338 Ill. 441, 170 N. E. 735, 80 A. L. R. 638. The Attorney General and the Insurance Commissioner recognized that such companies may make assessments in anticipation of losses to occur within sixty days, and use the fund thus obtained to pay losses as they accrue. Our statute, SDC 31.1903, requires all such companies to create and maintain a surplus or emergency fund of $25,000. We are convinced,

therefore, that the so-called assessment life insurance plan of insurance as it is known generally today, and as set up in our law is not the pure type of assessment insurance. The pure type contemplates that assessments may be made only to cover losses that have occurred, and that assessments cannot be levied in anticipation of losses. Vance on Insurance, Second Edition, page 53, comments as follows: "Theoretically, assessment insurance should be the cheapest and most satisfactory form for determining the charge which should fall upon every member of a class of persons insured in return for the indemnity guaranteed. Pure assessment insurance requires that the loss that may be suffered in the case of the death of any person in the class insured shall be met by levying a proportionate assessment upon all of the surviving members of that class, with such additional amount as may be necessary to defray the expenses of administration. It is plain that the charges made for insurance under the assessment plan would thus closely approach the actual cost of the insurance, the method of levying insurance (sic) after the loss has accrued eliminating any necessity for calculating probabilities. But in the practical conduct of assessment companies it is found that it is impossible to apply successfully the pure theory, described above, inasmuch as there is no means of insuring the faithful performance by all of the insured of their agreement to pay all assessments levied. Experience shows that the members of such companies will pay the assessment when they deem it to be to their advantage to do so, but otherwise they will not. Consequently it is impossible, in cases where pure assessment insurance is put into practice, to determine beforehand what is going to be the amount realized by any assessment that may be levied. As a result, promises to pay losses are rendered uncertain, and the company is apt to be abandoned by those who do not feel inclined to pay assessments, when uncertain whether the obligation of the company to themselves will be met when it matures. In order to do away with this element of weakness in the conduct of assessment insurance, it is found necessary to secure to the insurer some means of penalizing the members

for a failure to pay assessments. This is ordinarily accomplished by requiring that certain dues and fees, somewhat in the nature of the premiums of level premium companies, shall be paid in at stated intervals by the members of the assessment company. The funds so received are used to defray expenses, and also to accumulate a sort of reserve, known as the 'emergency fund'. In case of the failure on the part of any member to pay any assessment when properly levied, his interest in the reserve fund to which his previous payments have contributed, will be forfeited. In this way assessment insurance associations, which are usually in the form of some fraternal organization, that may include insurance as only one of its purposes, have become very numerous, and carry on life and accident insurance extensively, and with considerable success, although on account of insufficient rates and unbusinesslike management, failures among them have been numerous."

We mention this concept of assessment insurance at the outset because much of respondent's argument is predicated upon the postulate that the creation and maintenance of reserve or surplus funds by an assesment insurance company is contrary to the theory of such insurance. True, the maintenance of such funds is contrary to the theory of pure assessment insurance, but as we read the cases and writings upon the subject, including statutory provisions, it is now generally recognized that in order to function such companies must have funds in reserve. Whether such funds are designated as reserve, surplus or emergency funds is immaterial.

■ Assessment life insurance, like any other insurance is a matter of contract. Masonic Aid Ass'n v. Taylor, 2 S. D. 324, 50 N. W. 93. We are of the opinion, therefore, that under its articles of incorporation and in the absence of any statutory provision to the contrary the appellant company could contract with its members for the creation and maintenance of a reserve or surplus fund. 1 Couch on Insurance, Sec. 252a. Hence, we reach that question which has been so ably argued and presented by counsel. Do the provisions of SDC 31.19 expressly or by implication prohibit

such companies from creating a surplus fund in addition to the $25,000 emergency fund required by SDC 31.1903? For the reasons given above we are unable to approach this question and the construction of our statutes with the fixed notion that the creation of such fund is contrary to the theory of assessment insurance, and that absent explicit provisions to that effect, statutes regulating the assessment insurance business could not conceivably be construed as permitting the creation of such surplus fund, as contended by respondents. Nor do we approach the question with any fixed notion as to whether assessment insurance is sound from either a business or actuarial point of view. The legislature has, in any event, seen fit to permit and regulate this type of insurance, and our purpose is to attempt to give to the statutes that effect which we believe the legislature intended.

The first session of our legislature after statehood enacted a comprehensive law to regulate and control insurance companies Ch. 51, Laws of 1890. Commencing with Sec. 32 of this act the legislature undertook the regulation and control of assessment companies, which included "Every corporation or association organized under the laws of this State upon the mutual assessment, co-operative or natural premium plan for the purpose of insuring the lives of individuals * * *." Sec. 37 of this 1890 Act provided "The by-laws of any such corporation or association, and its notices of assessment, shall state the object or objects for which the money to be collected is intended, and no part of the proceeds of such assessments shall be applied to any other purpose than is stated in said notices and by-laws, and the excess beyond payment of the benefit provided for in such assessment shall be set aside and applied only to such purposes as said by-laws and notices specify." Clearly, this Sec. 37 was an express recognition by the legislature that assessments were not limited to the "payment of the benefit provided", but that assessments might be in excess of such payment. The only limitation upon such excess provided by this section is that such excess shall be applied "to such purposes as said by-laws and notices specify." That it was

not contemplated that the assessments should be excessive only to the extent necessary to pay death claims as experience has shown may be expected to accrue within a period of sixty days, as ruled by the Commissioner, is indicated by Sec. 40 of the act which requires every such "corporation or association" accumulating any trust fund or moneys to invest them in certain securities, and added the proviso, that such funds might be invested in South Dakota real estate to the extent that it "is necessary for its accommodation in the transaction of its business * * *." That this Sec. 40 related to assessment companies is made clear from its placement in the act, its language, and especially from the fact that Sec. 18 of the act provided for the investment of funds of companies organized under the first portion of the act. It seems apparent, therefore, that at the inception of our laws regulating this type of insurance there was no intention to limit such companies or associations to the pure assessment type of insurance, and while there is no express authorization for these companies to create reserve or surplus funds, there is nevertheless, a clear recognition on the part of the legislature that these companies would by so providing in their by-laws acquire surplus funds, and safeguards were provided for the investment of such funds.

The intent and purpose we have observed in the 1890 act was further evidenced in 1919 when the legislature passed an act providing for certain policy provisions to be contained in insurance policies issued by assessment associations. Sec. 2 of this 1919 act provided, "A provision shall be contained in every policy contract or certificate providing that the liability of the insured is not limited to the premium specified or fixed in the policy contract or certificate, and that the association may levy additional amounts or assessments as are necessary to pay all claims and maintain such funds as are provided for by the constitution and by-laws of the association." Ch. 230, Laws of 1919. Clearly, this 1919 act is an express legislative recognition of the power and authority of assessment associations to maintain such funds as are provided for by the constitution and by-laws of the association and to levy assessments therefor. These three

provisions, that is, Secs. 37 and 40 of the 1890 act, and Ch. 230, Laws of 1919, have been carried forward to our present law in substantially their original form in SDC 31.1904, 31.1908 and 31.1910. It is significant that these old provisions have been carried into our law under the general title of "Assessment Life, Health, Accident, and Casualty Companies." Respondent contends that SDC 31.1908 no longer applies to assessment companies because it does not specifically include such companies. However, as we have stated, this section of our code is included in that part of our law relating to assessment companies, and now refers to mutual companies. A mutual company is defined by SDC 31.0101 as "an insurance company which is organized on the mutual plan, and which does not have capital stock; * * *". This definition is in a sense generic and is broad enough to include assessment companies. As we look to the history of this section and its present placement in our law, we are convinced that there can be no question but that it presently applies to assessment companies. We revert to the explanatory note to the code by the Code Commission wherein it is stated, "except where a contrary intention plainly appears, it should not be inferred from any such change that a change in the meaning of the statute was intended."

It was in 1917, Sec. 3, Ch. 274, Laws of 1917, that the forerunner of SDC 31.1903 came into our law. It is contended by respondent that this section of our law which requires each assessment company to maintain a $25,000 emergency fund is now exclusive, and that it is not within the power of such companies to maintain surplus funds in excess of this required fund. That the requirement that such fund be maintained was not exclusive in 1917 is clearly evident from the last sentence of the 1917 act which was explicit in providing that "nothing herein contained shall prevent the creation and accumulation of other funds in excess of the amount herein required to provide for the purposes of such corporation or association." In 1935 when the requirement for an emergency fund contained in the 1917 law was reenacted by Sec. 3, Ch. 133, Laws of 1935, the last sentence of the 1917 law was omitted, however, between

1917 and 1935 the above mentioned Chapter 230, Laws of 1919, was enacted which in part provided "that the association may levy additional amounts or assessments as are necessary to pay all claims and maintain such funds as are provided for by the constitution and by-laws of the association." It might well be that in 1935 the legislature felt that with this clear recognition in 1919 of the power and authority of assessment associations to maintain surplus funds that the last sentence of the 1917 law was no longer necessary. In any event, we are of the opinion that had the legislature intended to override the policy which we believe has been apparent from certain provisions in the law since statehood, and which provisions were retained, it would have done so in express language. Nor would it seem reasonable to hold, in the absence of clear language so compelling, that the legislature intended that the company with the least members must maintain the $25,000 fund, but that a company with ten times such membership, and carrying a risk ten times that of the smallest company, could not maintain or acquire a larger fund.

Whether there is a limitation upon the surplus funds which an assessment company may acquire, other than the limitation provided by competition with other similar companies, we need not decide in this proceeding. From what we have said above it is apparent that in our opinion the limitation of such fund to a size sufficient to pay promptly death claims which experience has shown may be expected to accrue within a period of sixty days, as announced by the Attorney General, finds no support in our law either from express provision or by implication, to the contrary the clear implication of SDC 31.1908 is directly opposed to the holding of the Attorney General and Commissioner. If the size of such fund is limited to an amount that is reasonable for this company to maintain we have no record or evidence upon which to base a determination of whether the surplus funds acquired by appellant are or are not reasonable in amount.

The order appealed from is reversed.

All the Judges concur.